## THE CHARLES TIBERGHIEN.

(District Court, S. D. New York. September 19, 1906.)

SHIPPING—SUIT FOR NONDELIVERY OF CARGO—EVIDENCE.

Evidence considered, and *held* not to sustain the claim of libelants of a shortage in delivery of goods shipped from New York to China in bales, but to show by a preponderance that the apparent shortage, as shown by the tally made at the time of discharge, arose from the fact that in many cases two bales were trussed together in one package and such packages were erroneously counted as one bale.

In Admiralty. Suit to recover for nondelivery of cargo.

Wing, Putnam & Burlingham, for libellants.

Convers & Kirlin and John M. Woolsey, for the Charles Tiberghien.

Alexander & Ash, for the Philippine Company.

ADAMS, District Judge. This action was brought by Arnhold, Karberg & Company against the steamship Charles Tiberghien to recover the value of 103 bales of domestics, which it is claimed were shipped on the steamer at New York on or about the 9th day of July, 1902, for delivery at the port of Tientsin, China. The value of the goods, with the advanced freight paid thereon, amounted in all to the sum of $6,100. On the 19th day of February, 1903, the claimant of the said steamer, filed a petition alleging that the Philippine Transportation & Construction Company was the charterer of the steamer and responsible if any loss occurred, prayed that said company be brought into the action and proceeded against instead of the steamer. Process was accordingly issued against the Philippine Company. Later, answers were filed on behalf of the steamer and of the third party.

It appears that there were two charter parties under which the Philippine Company operated the steamer during the period covering the controversies herein. They were dated April 29, 1902, and made between the agents of the steamer and the Philippine Company. The first provided for a voyage from New York to Hong Kong and Manila, charterer to have the privilege of first sending the vessel to Manila if it desired, and for an additional charter for another month.

The second charter, under the form of a time charter, provided for a month's extension, more or less, from date of delivery under the first charter for the ports of Manila, Hong Kong, Chinese, and Japanese ports. One of its provisions was:

"14. It is understood that this charter is simply an option given by the owners of the steamship 'Charles Tiberghien,' and that if the Philippine Transportation & Construction Co. wish to avail themselves of this charter, they must so notify Master on or before steamer's arrival at Singapore for coal."

This option was duly availed of, by notification to the master at Singapore, where the steamer went for coaling purposes, about the 28th of August.

The master of the steamer gave a written authority to the charterer to sign bills of lading for him. They were accordingly given and contained an acknowledgment for 2,400 bales of domestics of which, it is claimed, 103 were not delivered. It is also claimed that 2 bales of another lot were not delivered. These were all receipted for on the faces of the bills of lading as being destined for Shanghai but on the backs were marked for Tientsin. The latter place was approached through the Taku roadstead which was its port, some 40 or 50 miles away, and the goods for Tientsin were lightered from Taku.

Many of the bales of domestics were shipped two together, i. e., two were fastened together by means of ropes or iron bands, and called "truss packages." No special allusion was made to these in the orig-

inal bills of lading. A bill of lading which went to China, was produced by the libellants after the trial and admitted in evidence by consent of all the parties. There were entries on the back of this bill showing that 200 bales of domestics were equal to 100 packages. There was a pencil memorandum to the same effect with respect to 60 bales of domestics. The receipt on the face of the bill of lading was for 260 bales equal to 160 packages.

The bills of lading do not state that the goods were shipped on the steamer but that they were received on the dock to be transported by the steamer. When some of the goods were delivered on the dock, the steamer was not there but came subsequently. In the meantime, receipts had been given, which were mislaid before the trial but since have been found among the papers left with the original proctor for the Philippine Company, Mr. Sherman, now deceased, and admitted in evidence. They show the delivery of the goods on the dock and that upon them the bills of lading were issued. Testimony taken by the libellants from the cartmen, who carried the goods from the Providence Line to the dock, shows that they were delivered there, i. e. at pier 40, which is a covered closed pier and one-half devoted at the time to this steamer. There is nothing to indicate any loss of the goods after delivery but everything tends to show that they went on the steamship. The size, 4 feet long, 2 feet wide and 2 feet high each, and weight, 250 to 300 pounds each, of these packages are, in connection with the other testimony, persuasive evidence of their not having been removed after delivery on the dock and it clearly appears that everything on the dock was put aboard the steamer. The goods for the different ports were separated by painting the edges or sides of bales, according to a stowage plan made by the stevedore which was given to the chief officer.

One of the first ports of discharge was Manila. The steamer arrived there September 5th and left September 24th. The next port of discharge was Hong Kong. The steamer arrived there September 27th and sailed again the 29th, after discharging her cargo for that port. All the cargo discharged there was delivered to the libellants, who at this port, as well as others, were agents for the Philippine Company. There were apparently no domestics discharged there.

It appears that the said to be missing goods went aboard the steamship at New York and were not discharged at the early ports. It remains to determine whether they were subsequently delivered to the libellants or were in some way lost by the steamship, because at the end of the voyage she had no merchandise on board. There is no proof whatever that the steamship lost any of the goods and such is only attempted to be established by the claimed non-delivery. The case is a difficult one to determine upon the facts, but I am rather inclined to believe that the libellants actually received the goods either at Tientsin or at Shanghai. The supposed loss doubtless occurred by reason of the method of packing some of the goods, that is putting two bales into one package, and discharging the two bales so packed as one.

At Manila a manifest of the cargo for that port was handed to the master by the chartered agent, but this was the only port at which the ship received any document by means of which she could check the delivery. The cargo for that port was in different compartments from those which contained the bales for Tientsin and Shanghai and the latter were not in any way disturbed at Manila and the steamer, when she left there, had on board all the cargo for subsequent ports. The next port of discharge was Hong Kong, where she reported to the libellants, pursuant to the instructions of the charterer's Manila agent. There were no bales of domestics for that port and none were discharged there. The stowage of the bales destined for Shanghai and Tientsin was not disturbed.

At the completion of the discharge in Hong Kong, the ship went under the new charter and at that time she had on board all the domestics which had been shipped for Shanghai and Tientsin in the same places they had been stowed in New York by the charterer's stevedore.

This new charter constituted a demise of the vessel and subsequently the charterer was, as between it and the ship, responsible for any shortage of cargo, but there does not seem to have been any shortage in the delivery. She arrived at Shangai the 4th of October. She there reported to the libellants, as agents of the charterer, and they took charge of the discharge. They ordered the vessel to a pontoon or float, on which the cargo was discharged and was then carried ashore by coolies by means of two bridges, where the libellants warehoused it. It was tallied on the shore end of the bridges by a ship's officer and a Chinese talleyman. The latter furnished the officer with a box divided into 20 compartments and had a similar one himself full of small bamboo sticks, five in each compartment, and as the coolies brought the packages from the pontoon, the talleyman handed to the officer one of the sticks for each separate package. Five of these sticks were placed by the officer in each compartment of his box and when it was full it indicated that 100 packages had been sent ashore. The officer would then return his full box to the talleyman, taking the latter's empty box and the process would continue, each 100 packages being noted in a memorandum book. 300 of the bales of domestics destined for Shanghai were bound together in trusses as described above, making 150 packages. These 150 packages were delivered at Shanghai, and appear to have been represented by one of the talleyman's sticks. It would seem that this caused the confusion and the apparent deficiency. The packages were apparently counted as one bale, while in the manifest they were entered as two bales and made a larger delivery at Shanghai than was intended and required a resort to the Tientsin cargo to supply the deficiency. It was not difficult to make mistakes in this respect as the separation between the two ports was not marked on particular packages but by perpendicular or horizontal lines covering a number of packages and indicating a general portion of the cargo.

When Tientsin was reached the deficiency was discovered but no notice given to the ship of it for several days although the bills of

lading reasonably required notice within 48 hours. This, however, should not be considered as a defense as the charterer had no resident agent at Tientsin and the only one to whom such a requirement would apply was the master of the vessel and he sailed with her the next day after the delivery of the last lighter load and was thereafter inaccessible, as the ship was at sea, until her arrival back at Shanghai, October 28th, when notice of the shortage was given to the master.

To summarize, it appears that the missing goods were duly delivered on the vessel in New York, remained aboard when she sailed from Manila and were, in all probability, delivered to the libellants at Shanghai, where they were acting as the charterer's agents. The evidence satisfies me, however, that the goods reached the libellants, and the mere fact that they were then acting as agents should not suffice to excuse them for their own delinquency or mistake with reference to the truss packages. If the goods actually reached their true destination, though such fact was not recognized by the libellants, it would be unjust to impose upon the ship, or the charterer, any loss occasioned through a mistake on the part of the libellants.

The libel and petition are dismissed.